## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SONICBLUE AEROSPACE, INC., a Delaware corporation, | ) ) ) | Civil Action |
| | ) | No. ____ |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| ROLLS-ROYCE HOLDINGS PLC, ROLLS-ROYCE CORPORATION, ROLLS-ROYCE NORTH AMERICAN TECHNOLOGIES, INC., KONGSBERG GRUPPEN ASA, KONGSBERG MARITIME AS, AND KONGSBERG MARITIME, INC. | ) ) ) ) ) ) ) | **JURY TRIAL DEMANED** |
| Defendants. | | |

## <u>COMPLAINT</u>

AND NOW, comes Plaintiff, by and through legal counsel, files this Complaint, with any exhibit identified herein hereby incorporated herein by this reference, against Defendants Rolls-Royce Holdings, plc, Rolls-Royce North America, Inc. Rolls-Royce Corporation, and Rolls-Royce North American Technologies, Inc. (individually and collectively, **"Rolls-Royce"**), and Kongsberg Gruppen ASA, Kongsberg Maritime AS, and Kongsberg Maritime, Inc. (individually and collectively **"Kongsberg"**), allegeing as follows:

## <u>NATURE OF THE ACTION</u>

1.        SonicBlue brings this civil action, *inter alia,* seeking damages and injunctive relief arising out of Rolls-Royce's and Kongsberg's infringement of U.S. Patent No. 8,446.060 (the "**'060 patent**") (attached as <u>Exhibit A</u>) and breach of a related contract between SonicBlue and Rolls-Royce Corporation (attached as <u>Exhibit B</u>) and the misappropriation of certain related SonicBlue trade secrets by Rolls-Royce.

## PARTIES

2.      The Plaintiff, SonicBlue is a corporation organized under the laws of Delaware having a principal place of business at One Union Street, Suite 200, Portland, Maine 04101. SonicBlue is a leading innovator in the field of turbojet engines for aerospace and marine applications.

3.      On information and belief, Defendant Rolls-Royce Holdings, plc is a public limited company organized under the laws of England in the United Kingdom having a principal place of business at Kings Place, 90 York Way, London, N1 9FX, England, United Kingdom.

4.      On information and belief Defendant Rolls-Royce North America, Inc. is a corporation organized under the laws of Delaware having a principal place of business at 1900 Reston Station Boulevard, Floor 4, Reston, Virginia 20190. On information and belief Rolls-Royce North America, Inc.is a wholly owned subsidiary of Defendant Rolls-Royce Holdings, plc.

5.      On information and belief, Defendant Rolls-Royce Corporation is a corporation organized under the laws of Delaware having a principal place of business at 450 South Meridian Street, Indianapolis, Indiana. 46225.   On information and belief Defendant Rolls-Royce Corporation is a wholly owned subsidiary of Defendant Rolls-Royce North America, Inc.

6.      On information and belief, Defendant Rolls-Royce North American Technologies, Inc. is a corporation organized under the laws of Delaware having a principal place of business at 2001 South Tibbs Avenue, Indianapolis, Indiana 46241.  On information and belief Defendant Rolls-Royce North American Technologies, Inc.is a wholly owned subsidiary of Defendant Rolls-Royce Corporation.

7.     On information and belief, Defendant Kongsberg Gruppen ASA is a public limited liability company (Allmennaksjeselskap) organized under the laws of Norway having a principal place of business at Kirkegårdsveien 45, NO-3616 Kongsberg, Norway.

8.     On information and belief, Defendant Kongsberg Maritime AS is a public limited liability company (Allmennaksjeselskap) organized under the laws of Norway having a principal place of business at Stranpromenaden 50, 3183 Horton, Norway. On information and belief Defendant Kongsberg Maritime AS is a wholly owned subsidiary of Defendant Kongsberg Gruppen ASA.

9.     On information and belief Defendant Kongsberg Maritime, Inc. is a corporation organized under the laws of Texas having a principal place of business .at 10777Westheimer Road #1200, Houston. Texas 77042.  On information and belief Defendant Kongsberg Maritime, Inc. is a wholly owned subsidiary of Defendant Kongsberg Maritime AS.

## JURISDICTION AND VENUE

10.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*  This is also an action arising under the Defend Trade Secrets Act (DTSA), 18 U.S.C. §§ 1905 *et seq.*   This Court thereby has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

11.     With respect to Defendants Rolls-Royce Holdings, plc, Rolls-Royce North America, Inc., Rolls-Royce Corporation, and Rolls-Royce North American Technologies, Inc. this is also a related breach of contract action and a trade secret misappropriation action under Indiana state law and a related trade secret misappropriation action under Maine state law.  These claims under state law are so related to the claims within the original jurisdiction that they form

part of the same case or controversy under Article III of the Constitution.  This Court thereby has jurisdiction under 28 U.S. C. § 1367.

12.     With respect to Defendants Rolls-Royce Holdings, plc, Kongsberg Gruppen ASA, and Kongsberg Maritime AS, there is diversity of citizenship between a citizen of a State and a citizen or subject of a foreign state in which the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court thereby has jurisdiction under 28 U.S.C. § 1332(a).

13.     This Court has personal jurisdiction over Defendants Rolls-Royce Holdings, plc, Rolls-Royce North America, Inc., Rolls-Royce Corporation, and Rolls-Royce North American Technologies, Inc. because, among other reasons, on information and belief they do business in Pennsylvania and in this District.

14.     This Court has personal jurisdiction over Defendant Kongsberg because, among other reasons, it does business in Pennsylvania and in this District.

15.     With respect to Defendants Rolls-Royce venue is proper under 28 U.S.C. §§ 1391(b)(2) and 1400(b) because, on information and belief, Rolls-Royce has a regular and established place of business in this District at 410 Rouser Road, Moon Township, Pennsylvania 15108 and has committed acts of infringement in this District.  With respect to Defendant Rolls-Royce Holdings, plc, in particular, venue is also proper under 28 U.S.C. § 1391(c)(3) since it is a foreign entity which may be sued in any judicial district.

16.     With respect to Defendants Kongsberg venue is proper under 28 U.S.C. §§ 1391(b)(2) and 1400(b) because, on information and belief, Kongsberg has a regular and established place of business in this District at 210 Industrial Park Road, Johnstown, Pennsylvania 15904, and has committed acts of infringement in this District.  With respect to Defendants Kongsberg Gruppen ASA and Kongsberg Maritime AS, venue is also proper under

28 U.S.C. § 1391(c)(3) since they are foreign entities which may be sued in any judicial district.

FACTUAL ALLEGATIONS

### Facts Relating Primarily to the Breach of the Nondisclosure Agreement and Trade Secret Misappropriation

17.     SonicBlue was founded on June 4, 2004 by Richard H. Lugg, a distinguished aerospace engineer.  Mr. Lugg's goal in founding SonicBlue was to develop improved turbojet engines for aerospace and marine applications and, among other things, to provide high performing turbojet engines with significantly reduced greenhouse gas emissions.

18.     Mr. Lugg was successful in these endeavors and since the founding of SonicBlue the company was awarded eleven (11) United State patents, including the '060 patent.  SonicBlue also developed many important trade secrets and also filed three (3) still pending United States patent applications.  In addition to this patented technology, Mr. Lugg and SonicBlue developed a substantial amount of proprietary and confidential information on the subject of improved turbojet engines (the "**Trade Secrets**").  While SonicBlue was initially founded in California, Mr. Lugg shortly thereafter moved the business to Portland, Maine.  Most of the Trade Secrets at issue were developed in Maine.

19.     Because of the importance of SonicBlue's Trade Secrets Mr. Lugg believed that it was important that he find a partner in the industry who was a major engine manufacturer so as to realize the potential of the Trade Secrets.  In order to share his developments with the rest of the industry and help reduce carbon dioxide and other greenhouse gas concentrations in general, Mr. Lugg proceeded to try to contact a number of leading turbojet engine manufacturers in an attempt to try to interest them in the SonicBlue technology. Mr. Lugg initiated these attempted contacts from his business location in Portland, Maine.

5

20.     In late November 2004 while in Portland, Maine, Mr. Lugg made a cold telephone call to a Rolls-Royce location in Indianapolis, Indiana.  After a number of additional calls to Rolls-Royce at this location in early December, 2004, Mr. Lugg was able to speak to Ronald York who was identified as being the Chief Executive Officer of Rolls-Royce.

21.     At the time Rolls-Royce was competing for a United States Department of Defense contract to provide the turbojet engine for the then proposed Joint Strike Fighter (JSF) which subsequently became identified as the F-35 Lightning II.  The JSF was to be designed to meet the particular operational needs of the United States Air Force, the United States Navy, and the United States Marine Corps in a strike fighter aircraft.

22.     While the Air Force planned to usually base its F-35A variant of JSF using conventional runways and the Navy planned that its F-35B variant would be mainly a carrier-based aircraft, the Marine Corps planned to often forward deploy its F-35B variant in a close air support role for its ground forces.  Consequently, the Marine Corps F-35B variant of the JSF was to have a Vertical Take-off and Landing (VTOL) capability.

23.     The Marine Corps F-35B JSF variant would be the heaviest fixed wing VTOL aircraft to have been built to that point, and providing an engine with sufficient torque to vertically lift the aircraft on take-off was considered to be a major challenge for the selected engine provider.  Furthermore, it was widely believed that the JSF contract would be the largest single defense contract to be awarded to that point, and it was considered likely by many in the industry that the prime contractor and the engine contractor which succeeded in perfecting the VTOL capability would have a major advantage in being selected as the successful bidder.

24.     Rolls-Royce had partnered with General Electric in its proposal to build the engine for the F-35 JSF.  Rolls-Royce had the responsibility for developing the fan for the VTOL

F-35B.  Mr. Lugg understood that Rolls-Royce to that point was still facing significant challenges in perfecting the VTOL capability for the JSF F35B and that Ronald York was particularly interested in speaking to him with respect to any ideas that he might have on this subject.

25.      Subsequently SonicBlue entered into a Nondisclosure Agreement with Rolls-Royce and Mr. Lugg and a number of his colleagues at SonicBlue were invited to meet with Rolls-Royce at one of its facilities at Indianapolis, Indianapolis.  Along with his colleagues at SonicBlue, Mr. Lugg in 2005 traveled from Portland, Maine to Indianapolis and met with Rolls-Royce. At his first meeting with Rolls-Royce in Indianapolis, Mr. Lugg met with Ronald York along with Philip Burkholder who was identified as Rolls-Royce's Chief Operating Officer and Bernard Rezi who was identified as Rolls-Royce's Chief Engineer.

26.      Mr. Lugg continued to have meetings with Rolls-Royce on an approximately monthly basis until 2007.  During these meetings Mr. Lugg disclosed to Rolls-Royce a substantial number of the Trade Secrets in numerous written disclosure documents which were transferred from SonicBlue to Rolls Royce under the Nondisclosure Agreement.

27.      Included in the Trade Secrets which Mr. Lugg disclosed to Rolls-Royce was an engine design comprising a shaftless gas turbine with electromagnetic fans.  Among other things it was disclosed that if electric ring motors would be used that the hub portion of the rotors might be eliminated.

28.      These parts of the Trade Secrets were disclosed to Rolls-Royce, among other ways, in a pair of white papers and in a research and development contract proposal.  In 2005, Mr. Lugg disclosed a white paper to Rolls-Royce entitled "Technical Concept White Paper for a Urban VTOL Hybrid Aircraft" attached as Exhibit C (redacted).

29.     In about January–March, 2006 Mr. Lugg disclosed to Rolls-Royce a Proposal to the Defense Advanced Research Projects Agency (DARPA) entitled "Advanced Integrated Ring Motor and Lift Fan Technology" which is attached, in part, as <u>Exhibit D</u>.  (Since this Proposal may contain information which is still proprietary and confidential it is not attached in full.)  Other Trade Secrets, including a second DARPA proposal entitled, "Hybrid Integrated Lift and Propulsion System" that is still considered proprietary and confidential were also disclosed.  On or about January 9, 2007 Mr. Lugg disclosed to Rolls-Royce a SonicBlue white paper entitled "Electric Turbine Compressor Fan for Hybrid Propulsion" which is attached as <u>Exhibit E</u> (redacted).

30.     After Rolls-Royce had received and studied the Trade Secrets Mr. Lugg was then invited by Rolls-Royce to the Rolls-Royce corporate headquarters in London, United Kingdom.  In November 2009 Mr. Lugg traveled to London and met with senior Rolls-Royce management to discuss the Trade Secrets.  He was invited back to London to present a proposal to license the Trade Secrets to Rolls-Royce.   In February 2010, Mr. Lugg returned to London and met with senior management including Paul Stein who was identified as the Rolls-Royce Chief Technology Officer and with Philip Burkholder who was identified as having been promoted to Chief of Operations of the parent company in London. At that meeting, Mr. Lugg presented a proposal to license the Trade Secrets and other SonicBlue technology to Rolls-Royce.

31.     Subsequently, in June 2011, Mr. Lugg attended the Farnborough Air Show in the United Kingdom and again meet with senior Rolls-Royce management including Paul Stein.  At this meeting which was held at Farnborough, United Kingdom, Paul Stein informed Mr. Lugg that he was impressed with certain Trade Secrets disclosed to Rolls-Royce but that Rolls-Royce would decline the Trade Secret license proposal because Rolls-Royce ordinarily did not wish to

license technology from outside the company and preferred to develop technology in house.

32.    Based on the assurances received from Paul Stein that Rolls-Royce would not be using the Trade Secrets disclosed to it and would likely be developing its own technology, Mr. Lugg reasonably believed that Rolls-Royce would not be using the Trade Secrets which he had disclosed to it.  Accordingly, he discontinued further efforts to interest Rolls-Royce in the Trade Secrets and proceeded with efforts to have SonicBlue independently develop and commercialize its technology.

33.    More recently, however, Mr. Lugg became aware of a Rolls-Royce publication entitled "Ship Efficiency—Permanent Magnet Technology" shown at https://www.ervo-group.eu/np4/np4/%7B$clientServletPath%7D/?newsId=28&fileName=17.pdf, Exhibit F.    It will be seen that on pages 3-4 of this publication a time line is shown indicating that from about 2005–2009 a first permanent magnet thruster with a shaftless gas turbine with electromagnetic fans was developed using the Trade Secrets.  From about 201 –2015 a second permanent magnet thruster was also developed using the Trade Secrets.  To the extent that this publication lacks full evidentiary support for this conclusion, SonicBlue contends that it will likely have full evidentiary support after a reasonable opportunity for further investigation or discovery.

34.    On information and belief Rolls-Royce subsequently commercialized the marine permanent magnet thruster which was developed using the Trade Secrets disclosed to it by SonicBlue.  As a result of its unauthorized use and public divulgement of the Trade Secrets, Rolls-Royce was unjustly enriched in developing a marine permanent magnet thruster which was subsequently commercialized by Rolls-Royce.

**Facts Relating Primarily to Patent Infringement**

9

35.     Richard H. Lugg is the inventor named on the '060 patent.  SonicBlue is the owner and assignee of 'the '060 patent.  The '060 patent is entitled "Magnetic Advanced Gas Turbine Transmission With Radial Aero-Segmented Nanomagnetic-Drive (MAGTRAN)," which was duly and legally issued on March 21, 2013.  As noted above, a true and accurate copy of the '060 patent is attached as Exhibit A.

36.     The '060 patent discloses an electrical machine apparatus having magnetic gearing embedded therein includes a moveable rotor having a first magnetic field associated therewith, a stator configured with a plurality of stationary stator windings therein, and a magnetic flux modulator interposed between the moveable rotor and the stator windings.  The magnetic flux modulator is configured to transmit torque between the first magnetic field associated with the moveable rotor and a second magnetic field through a movable stator, through a plurality of magnetic flux gates arranged axially in the modulator with the field excited by, and controlled by, eddy currents normal to the field through the plurality of stationary stator magnets governed by the position of the modulator rotating in reference to the rotating (at different speeds, hence flux paths) stator and rotor and their magnetic field poles, than the speed of the modulator and its interfering referenced field poles, with the eddy currents existing flux gate arrays with open or closing sequencing governing rotational speeds of the movable rotor, and enabling magnetic gear ratios, in respect to the driving movable stator, intermediate magnetic flux modulator, methods of a continuously variable, high torque, aero gas turbine transmission which allows for complete segmentation of turbomachinery stages (in respect to the bypass fan, compressor and power of the aero gas turbine).

37.     The accused Rolls-Royce marine permanent magnet thruster includes each element of one or more claims of the '060 patent, including at least claim 1 of the '060 patent.

38.    On information and belief Rolls-Royce sold its commercial marine business to Kongsberg on or about April 1, 2019, and Kongsberg has continued to sell and offer for sale the same products previously offered by Rolls-Royce including the accused permanent magnet thruster.

39.    The accused Kongsberg marine permanent magnet thruster includes each element of one or more claims of the '060 patent, including at least claim 1 of the '060 patent.

40.    Independent claim 1 of the '060 patent recites: An electrical machine apparatus comprising: A) a moveable rotor having a first magnetic field associated therewith; B) a stator configured with a plurality of stationary stator windings therein; and C) a magnetic flux modulator interposed between the moveable rotor and the stator windings, wherein the magnetic flux modulator is configured to transmit torque between the first magnetic field associated with the moveable rotor and a second magnetic field through the movable stator as is shown in the following FIG 1.  To the extent that this publication lacks full evidentiary support for this conclusion, SonicBlue contends that it will likely have full evidentiary support after a reasonable opportunity for further investigation or discovery.

### Claim 1 of US Patent No. 8,446,060

Claim Elements
Rolls Royce Permanent Magnet Motors

| An electrical machine apparatus comprising: | As seen from a video posted on You Tube by Rolls Royce at https://video.search.yahoo.com/yhs/search?fr=yhs-arh-001&hsimp=yhs-001&hspart=arh&p=rolls+royce%3A+permanent+magnet+technology+for+the+fishing+industry#id=1&vid=d94e5791cecba0db2ed315988e6c27d9&action=click, the video describes an electrical machines used in the marine industry |
| --- | --- |

| | |
|---|---|
| a movable rotor having a first magnetic field associated therewith; |   The movable rotor is shown as the inner most component with a central hub and radiating arms, and permanent magnets disposed around the outer periphery capable of generating a first magnetic field |
| a stator configured with a plurality of stationary stator windings therein; and |   A stator is shown with gold colored stator windings, in this exploded view intended to show the separate components of the stator and rotor, the windings capable of establishing a second magnetic field |
| a magnetic flux modulator interposed between the moveable rotor and the stator windings, | A magnetic flux modulator is visible from the aforementioned You Tube video, located between the stator and rotor.  Also, as seen in Rolls Royce Patent Application No. US2017141648A1, Rolls Royce uses an "inter-pole component disposed between the rotor and the stator for the purpose of varying a gear ratio between the rotor and stator (see US2017141648A1 Fig. 3).  The patent application filed by Rolls Royce tracks the You Tube video in terms of basic components and the description (from the video) of how the magnetic fields are arranged to impart torque to the rotor. |
| wherein the magnetic flux modulator is configured to transmit torque between the first magnetic field associated with the moveable rotor and a second magnetic field | See above, and from the You Tube video, the rotor rotates with nothing more than the interaction of magnetic fields between the rotor and stator.  NOTE: the stator is introduced in the claim as "a stator" and then reintroduced in the last clause of the claim as "the *movable* stator."  There is no antecedent basis for "the movable stator."  However, the word "movable" was not added to the claim to overcome prior art, and would appear to be a |

| | |
|---|---|
| through the moveable stator. | simple scrivener's error.  It is well known in physics and electrical engineering that an electric motor requires relative motion between a stator and a rotor.  When the stator is stationary, the rotating rotor will cause the machine to generate electricity.  The same machine can be an electric motor if the stator windings are supplied with electric current to generate a magnetic field, which interacts with the rotor magnets and its field to cause the rotor to rotate.  The rotating rotor, coupled to an output shaft, can drive any number of machines.  Marine applications of Rolls Royce permanent magnet motor include Azimuthing permanent magnet thrusters, described at https://www.rolls-royce.com/~/media/Files/R/Rolls-Royce/documents/marine-product-finder/rr-az-pm-broch190816.pdf.<br>As seen below, the azimuth thruster includes a rotor which performs as a propeller when actuated:<br><br>In a more detailed, schematic view of a Rolls Royce Tunnel Thruster, the rotor and stators are clearly visible: |



As described in the Rolls Royce posting, "the technology is based on electric drive where the motor is in the form of a ring round the propeller. The moving part of the ring is a rim around the propeller blades which carries a series of strong permanent magnets. The rotor, fitted within a series of magnets, turns within an outer ring which form the stator. When current is supplied to the motor from the variable frequency power supply the electromagnets are excited in a particular sequence and the resulting magnetic fields interact with the field from the rotor magnets creating a torque that turns the rotor and its propeller blades. At the centre of the thruster the propeller blades are joined to a hub, which has two functions; to carry the bearings taking propeller thrust and provide radial location of the rotor, and to improve the hydro-dynamic efficiency of the thruster. Loads are transferred to the stator through struts. Both rotor and stator are sealed against water ingress and operate fully submerged."

**COUNT I:**
**INFRINGEMENT OF U.S. PATENT NO. 8,446,060 BY ROLLS ROYCE**

41.     Plaintiff SonicBlue incorporates all paragraphs herein by reference.

42.     Rolls-Royce has directly infringed one or more claims of the '060 patent, including for example (but not limited to) at least claim 1 of the'060 patent, by making, using, selling, offering for sale, and/or importing into the United States the accused permanent magnet thruster without SonicBlue's authorization in violation of 35 U.S.C. §271(a).

43.     Rolls-Royce  has induced the infringement of the '060 patent, in violation of 35 U.S.C. §271(b), by actively and knowingly aiding and abetting others, including Rolls-Royce customers, to directly make use, sell, offer for sale, and/or import into the United States the accused permanent magnet thruster without SonicBlue's authorization, for example (but not limited to), at least claim 1 of the'060 patent, by making, using, selling, offering for sale, and/or importing into the United States the accused permanent magnet thruster without SonicBlue's authorization in violation of 35 U.S.C. §271(a).  Rolls-Royce has induced the infringement of the '060 patent, in violation of 35 U.S.C. §271(b), by actively and knowingly aiding and abetting others, including Kongsberg customers, to directly make use, sell, offer for sale, and/or import into the United States the accused permanent magnet thruster without SonicBlue's authorization.


## <u>COUNT II:</u>
### <u>INFRINGEMENT OF U.S. PATENT NO. 8,446,060 BY KONGSBERG</u>

44.     Plaintiff SonicBlue incorporates all paragraphs herein by reference 43.

45.     Kongsberg has directly infringed one or more claims of the '060 patent, including for example (but not limited to) at least claim 1 of the'060 patent, by making, using, selling, offering for sale, and/or importing into the United States the accused permanent magnet thruster without SonicBlue's authorization in violation of 35 U.S.C. §271(a).

46.     Kongsberg has induced the infringement of the '060 patent, in violation of 35 U.S.C. §271(b), by actively and knowingly aiding and abetting others, including Rolls-Royce customers, to directly make use, sell, offer for sale, and/or import into the United States the accused permanent magnet thruster without SonicBlue's authorization. for example (but not limited to) at least claim 1 of the'060 patent, by making, using, selling, offering for sale, and/or importing into the United States the accused permanent magnet thruster without SonicBlue's authorization in violation of 35 U.S.C. §271(a). Kongsberg has induced the infringement of the '060 patent, in violation of 35 U.S.C. §271(b), by actively and knowingly aiding and abetting others, including Kongsberg customers, to directly make use, sell, offer for sale, and/or import into the United States the accused permanent magnet thruster without SonicBlue's authorization.

**COUNT III**
**BREACH OF NONDISCLOSURE AGREEMENT BY**
**ROLLS-ROYCE UNDER INDANA COMMON LAW**

47.     Plaintiff SonicBlue incorporates all paragraphs herein by reference.

48.     Under Paragraphs 1 and 2 of the Nondisclosure Agreements Rolls-Royce was not to have used Proprietary Information for an unauthorized purpose or disclosed that information to any third party who does not have a need to know that information for the purposes set forth in the Agreement for the five (5) year term of the Agreement and five (5) years thereafter. This period of non-use and nondisclosure would have been until October 25, 2015.

49.     By using the SonicBlue Proprietary Information in developing and building the permanent magnet thruster according to the time line shown on pages 3-4 of the "Ship Efficiency-Permanent Magnet Technology" publication and making that information publicly known, Rolls-Royce breached the Nondisclosure Agreement.

16

50. SonicBlue has been damaged as a result of Rolls-Royce's unauthorized divulging and use of SonicBlue's Proprietary Information.

**COUNT IV**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT (DTSA),**
**18 U.S.C. §§ 1905 et seq. BY ROLLS-ROYCE**

51. Plaintiff SonicBlue incorporates all paragraphs herein by reference.

52. At the time of Rolls-Royce's unauthorized disclosure and use of SonicBlue's Proprietary Information Rolls-Royce knew or had reason to know that its knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy and limit its use. Although the initial misappropriation of the Trade Secrets preceded the enactment of the DTSA on May 11, 2016, the actions of Rolls-Royce constituted a continuing tort, and its unauthorized use of the Trade Secrets in developing the accused permanent magnet thruster, the use of which continued after May 11, 2016.

53. Plaintiff SonicBlue had derived value from the secrecy of the Proprietary Information disclosed to Rolls-Royce.

54. Plaintiff SonicBlue took reasonable means to protect the Proprietary Information disclosed to Rolls-Royce.

55. SonicBlue has been damaged as a result of this misappropriation of its Proprietary Information in this way by Rolls-Royce.

**COUNT V**
**VIOLATION OF THE MAINE UNIFORM TRADE SECRETS ACT,**
**MS 10 § 1541 et seq. BY ROLLS-ROYCE**

56. Plaintiff SonicBlue incorporates all paragraphs herein by reference.

17

57.     At the time of Rolls-Royce's unauthorized disclosure and use of SonicBlue's Proprietary Information Rolls-Royce knew or had reason to know that its knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy and limit its use.

58.     Plaintiff SonicBlue had derived value from the secrecy of the Proprietary Information disclosed to Rolls-Royce.

59.     Plaintiff SonicBlue took reasonable means to protect the Proprietary Information disclosed to Rolls-Royce.

60.     SonicBlue has been damaged as a result of this misappropriation of its Proprietary Information in this way by Rolls-Royce.

## COUNT VI
## VIOLATION OF THE INDIANA UNIFORM TRADE SECRETS ACT, IC 24 § 2-3-1 *et. seq.*   BY ROLLS-ROYCE

61.     Plaintiff SonicBlue incorporates all paragraphs herein by reference.

62.     At the time of Rolls-Royce's unauthorized disclosure and use of SonicBlue's Proprietary Information, Rolls-Royce knew or had reason to know that its knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy and limit its use.

63.     Plaintiff SonicBlue had derived value from the secrecy of the Proprietary Information disclosed to Rolls-Royce.

64.     Plaintiff SonicBlue took reasonable means to protect the Proprietary Information disclosed to Rolls-Royce.

65.     SonicBlue has been damaged as a result of this misappropriation of its

Proprietary Information in this way by Rolls-Royce.

**COUNT VII**
**CONVERSION**

66.     Plaintiff SonicBlue incorporates all paragraphs herein by reference.

67.      As a result of the actions set forth herein, the Defendants have converted to their profit and use the property of Plaintiff without justification or permission.

68.      Defendants' actions are without justification or authority.

69.      As a direct and proximate result, Plaintiff has suffered damage and will continue to suffer damage.

**COUNT VIII**
**CIVIL CONSPIRACY**
**Defendants Rolls-Royce**

70.     Plaintiff SonicBlue incorporates all paragraphs herein by reference.

71.     The Defendants Rolls-Royce have combined with a common purpose to do an unlawful act, or to do a lawful act by unlawful means, or for an unlawful purpose, as set forth above.

72.     As set forth above, Defendants Rolls-Royce have done and are doing an overt act or overt acts in pursuance of their aforesaid common purpose.

73.     As a direct and proximate result of the conspiratorial acts averred herein, Plaintiff has suffered damage and continues to suffer actual legal damage.

**RELIEF REQUESTED**

Plaintiff SonicBlue demands trial by jury on all issues so triable.

WHEREFORE, Plaintiff SonicBlue prays for judgment and relief including:

(A)   Judgment that Rolls-Royce has been and is infringing one or more of the claims of the '060 patent pursuant to 35 U.S.C. §§ 271(a), (b) and (c);

(B)   A permanent injunction enjoining Rolls-Royce and its officers, agents, servants, employees, attorneys, related business entities and those in active concert or 0participation with it from further infringement of the '060 patent;

(C)   Judgment that Kongsberg has been and is infringing one or more of the claims of the '060 patent pursuant to 35 U.S.C. §§ 271(a), (b) and (c);

(D)   A permanent injunction enjoining Kongsberg and its officers, agents, servants, employees, attorneys, related business entities and those in active concert or participation with them from further infringement of the '060 patent;

(E)   An award of all damages adequate to compensate SonicBlue for Rolls-Royce's infringement of the '060 patent, and in no event less than a reasonable royalty for Rolls-Royce's acts of infringement, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

(F)   An award of all damages adequate to compensate SonicBlue for Kongsberg's infringement of the '060 patent, and in no event less than a reasonable royalty for Kongsberg's acts of infringement, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

(G)   An award of all damages adequate to compensate SonicBlue for Rolls-Royce's breach of the Nondisclosure Agreement between SonicBlue and Rolls-Royce, and in no event less than the amount of Rolls-Royce's unjust enrichment resulting from

Rolls-Royce's breach of the Nondisclosure Agreement, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

(H) An award of all damages adequate to compensate SonicBlue for Rolls-Royce's misappropriation of the Trade Secrets, and in no event less than the amount of Rolls-Royce's unjust enrichment, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

(I) An award of all damages permitted by law, including, nominal, incidental, compensatory, punitive, and statutory;

(J) An assessment of costs, including reasonable attorney fees pursuant to 35 U.S.C. § 285;

(J) Such other and further relief as this Court may deem just and proper.

<div style="margin-left:40%">

**TECHNOLOGY & ENTREPRENEURIAL VENTURES LAW GROUP, PC**

_s/ Gregg Zegarelli_
Gregg R. Zegarelli

2585 Washington Road, Suite 134
Summerfield Commons Office Park
Pittsburgh, PA 1524-25651 USA
412.833.0600 f.412.833.0601
mailroom.grz@zegarelli.com

**MAINE CERNOTA & RARDIN**

_s/ Daniel Long_
_Of Counsel_

547 Amherst Street - 3rd Floor
Nashua, NH 03063-4000 USA
603.886.6100 f.603.886.4796
dlong@mcr-ip.com

_Attorneys for Plaintiff_

</div>