**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

SAMANTHA BISER,              )

                                  )

                                  )        Civil Action

                                  )

         **Plaintiff,**           )        No. _____

                                  )

        v.                   )

                                  )        JURY TRIAL REQUESTED

SLIPPERY ROCK UNIVERSITY,   )

                                  )

        **Defendant.**          )

                                  )

                                  )

                                  )

## COMPLAINT

AND NOW comes the Plaintiff, Samantha Biser, by and through her counsel, Kristen C. Weidus, Esq., Lisa Postlewait, Esq., and Ruder Law LLC, and alleges and avers as follows:

## PRELIMINARY STATEMENT

Plaintiff alleges that Slippery Rock University ("Defendant") violated Plaintiff's due process rights in dismissing her from its Physician Assistant Program, and the University also breached their contract.

## JURISDICTION AND VENUE

1.      This Complaint seeks appropriate relief for violations pursuant to a civil action under, *inter alia*, 42 U.S.C. §§ 1983 seeking damages against Defendant for committing acts, under color of law, with the intent and for the purpose of depriving Plaintiff of rights secured under the Fourteenth Amendment of the Constitution and laws of the United States, and for refusing or neglecting to prevent such deprivations and denials to Plaintiff.

2. This case arises under the United States Constitution and 42 U.S.C. §§ 1983 and 1988, as amended. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §1331 and 28 U.S.C. § 1343, as this action arises under the laws of the United States.

3. Further, this action seeks recovery of attorneys' fees and costs pursuant to §§ 1983 and 1988.

4. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. §§1391(b)(1) and 1391(b)(2). The actions complained of took place in this judicial district, evidence and pertinent records relevant to the allegations would be maintained in this judicial district, and the Defendant is present and/or conducts affairs in this judicial district.

5. The Court has supplemental jurisdiction pursuant to 28 U.S.C.A. § 1367 over claims brought pursuant to Pennsylvania state law because such claims arise from the same set of operative facts as those claims brought pursuant to the claims arising under the United States Constitution and 42 U.S.C. §§ 1983 and 1988. The facts underlying all claims herein raised are so related that they create the same case and controversy.

## FACTUAL ALLEGATIONS

6. Plaintiff began attending Slippery Rock University in the Summer of 2018 in their Master of Science Physician Assistant Studies Graduate Program.

7. Plaintiff took classes and was in good standing in this program during the Summer and Fall of 2018, as well as the Spring, Summer, and Fall of 2019.

8. Plaintiff earned a cumulative GPA of 3.703.

9.      During the Fall 2019 semester, Plaintiff made plans to perform her psychiatry

        rotation at Family Centers for Recovery/Wellington Retreat in Florida.

10.     On November 24, 2019, she booked an Airbnb in Lake Worth, Florida for herself

        and a fellow student to live off grounds during this rotation.

11.     The homeowner later canceled her reservation, and the Plaintiff could not find

        reasonably priced housing in the area.

12.     As a result, Plaintiff and her classmate made plans to stay onsite at Wellington

        Retreat.

13.     Plaintiff and her classmate arrived at Wellington Retreat around 9:00 P.M. on

        February 22, 2020.

14.     They buzzed in to have staff unlock the doors. Someone told them they would let

        them in shortly.

15.     Both students waited for approximately forty-five minutes, buzzing two times, until

        another student who was residing at Wellington Retreat let them into the facility.

16.     That student did not ask for identification or inquire about the reason for their visit.

17.     The Plaintiff and her classmate were eventually shown to their room by Wellington

        Retreat staff.

18.     On February 23, 2020, a housekeeper named Victor gave Plaintiff and her

        classmate a tour of the facility. Victor told them they could come and go as they

        pleased. He indicated the students who lived onsite did not have to come back every

        night, and unlike the patients, students did not have a curfew.

19.     The housekeeper emphasized that no one was to keep food in their rooms.

20.     The Plaintiff was not told any other rules at that time, and the housekeeper never mentioned that guests were prohibited.

21.     On Saturday evening, February 29, Plaintiff and her classmate took an Uber to West Palm Beach, where they had dinner. While at the restaurant, they met a family on vacation. They talked to the family for some time. Ultimately, a young adult member of the family opted to remain at the restaurant after his remaining family members departed.

22.     Plaintiff recalls having a couple of alcoholic beverages that evening, but she was not impaired or under the influence.

23.     As Plaintiff and her classmate made plans to return to Wellington Retreat, the young adult whose family has since left noted that his phone battery had died, and he could not call anyone or return to his family. He insisted on charging his phone at the residence of Plaintiff and her classmate.

24.     Not wanting to abandon the young adult and after pressure from her classmate, Plaintiff ultimately agreed to permit him to charge his phone at the residence.

25.     Plaintiff's classmate called an Uber to take the three of them back to their temporary residence at Wellington Retreat.

26.     Plaintiff does not recall encountering anyone at the facility when they returned that night.

27.     Their guest charged his phone in the Plaintiff and classmate's room at Wellington Retreat. However, because it was late all three soon fell asleep.

28.     The next morning, on March 1, 2020, their guest called an Uber, and Plaintiff showed him to the exit.

29.     On Monday, March 2, around noon, the Executive Director of Family Centers for Recovery/Wellington Retreat, Dr. Moran, called Plaintiff and her classmate into his office. Dr. Moran's assistant, Mr. Hector Sigler, was already present.

30.     During this meeting, Dr. Moran showed a video still to Plaintiff and her classmate, and he asked them to identify a person in the photo. Plaintiff and her classmate identified the individual as the guest who had slept in their room.

31.     Plaintiff and her classmate tried to speak to Dr. Moran and Mr. Sigler about what happened the night of February 29, but Dr. Moran would not permit them explain.

32.     Specifically, in response, Dr. Moran interrupted Plaintiff and said the students were required to leave Wellington Retreat grounds immediately. He also stated that they were being dismissed from their clinical rotation.

33.     Before leaving, Plaintiff and her classmate apologized for their actions.

34.     Plaintiff agreed to leave Wellington Retreat as a temporary resident, but she begged to continue her clinical rotation.

35.     Dr. Moran rejected Plaintiff's request to stay on as a student.

36.     Dr. Moran left the office less than ten minutes after the meeting began, and Plaintiff and her classmate remained with Mr. Sigler.

37.     Mr. Sigler indicated that he had to call Professor Buterbaugh from Slippery Rock University immediately to tell her about the students' removal from Wellington Retreat grounds and dismissal from their clinical rotation.

38.     Both students asked for time to call Professor Buterbaugh themselves.

39.     Mr. Sigler agreed to wait to call until after he finished his lunch.

40.     Plaintiff's classmate called Professor Buterbaugh and told her what happened. During this call, their Professor simply said she would be getting back them.

41.     Plaintiff and her classmate immediately packed their belongings and left the facility.

42.     Plaintiff participated in disciplinary meetings on March 4, 2020, and March 18, 2020.

43.     Before, during, and after these meetings, Plaintiff took full responsibility for her actions.

44.     Plaintiff admitted that she did not intentionally break a rule or engage in disrespectful behaviors.

45.     Plaintiff at no point intended to compromise patient safety.

46.     Plaintiff had no idea this alleged offense could cause dismissal from her rotation, much less Defendant's entire Physician Assistant Studies Graduate Program.

47.     During disciplinary meetings, Plaintiff told Defendant that no patient records were kept in her room, and a guest would not be able to access any patient information.

48.     Plaintiff informed Defendant that all patient information was on a secure and locked laptop.

49.     Dr. Moran and Mr. Sigler provided statements to Defendant. In their statements, they described Plaintiff as "sneaky" in the video surveillance footage.

50.     Plaintiff admitted that if she appeared "sneaky" in showing the guest out, it was only because she was embarrassed at the perception others may have when a young woman shows a guest out of her room in the morning.

51.    Defendant alleged Plaintiff engaged in inappropriate behavior and inappropriate conduct at Family Centers for Recovery/Wellington Retreat in violation of their program policy manual.

52.    Plaintiff asserted her conduct was a mistake, but also that it was not a valid basis for dismissal from the Defendant's graduate program.

53.    Plaintiff wrote an apology to Dr. Moran at Wellington Retreat.

54.    Plaintiff repeatedly apologized to Defendant's professors and staff.

55.    Plaintiff begged to be permitted to remain in the program and to be afforded an opportunity to complete her graduate degree.

56.    During Plaintiff's disciplinary meetings, she asked that the committee decelerate her rather than dismiss her. She offered to take classes or work in the field to prove her sincerity and worth, and she requested the opportunity to finish what she started, even if it meant repeating the clinical rotation year.

57.    Defendant rejected Plaintiff's request.

58.    On page 27 of Defendant's 2019-2020 PA Student Handbook it states: "Students may be subject to program probation for the following reasons: A lapse in professionalism, which can include but is not limited to: … 'Inappropriate, accusative, derogatory, argumentative, disrespectful or privileged information included in any kind of written materials, electronic mail, conversations, or comments in any open setting at the University or clinical site,' and 'Any other situation or condition not addressed in this list of behaviors will be considered independently according to the individual case.'…"

59.     Furthermore, page 28 of Defendant's PA Student Handbook indicates, "Students will be subject to program deceleration pending review for the following reasons: … 'A repeated lapse in professionalism.'…"

60.     Additionally, page 29 of this Handbook states, "Students will be subject to program dismissal pending program review for the following reasons: … 'Using or being under the influence of drugs or alcohol while participating in any program activity or while present in any facility where program activities occur.' …'Being dismissed from clinical site based upon inappropriate behavior or unprofessional conduct subject to review by the Faculty Executive Committee.'"

61.     Defendant's PA Handbook also indicates, "A student will receive written notice of their dismissal from the Program Director. If the student is on campus, the Program Director will attempt to schedule a meeting in person to give the written notice to the student. If the student is not on campus, or cannot return for a meeting, the letter will be sent to the most recent address provided to the program by the student, via Certified Mail. Upon receipt of the written notice, the student must sign one copy and return it to the Program Director to confirm receipt. It is the responsibility of the student to provide a current address or to return a signed copy of the written notice of dismissal."

62.     The PA Handbook in question has an appendix on page 43 to address deceleration and dismissal.

63.     Page 43 says, in part "The Program Director will draft a memo to Academic Records and Graduate Admissions to inform them of the decision…"

64.  Paragraph 5 of this page states, "If a student is decelerated and accepted back into the program, another memo will be written by the Program Director to request that Graduate Admissions change the student's status from Graduate Exploratory (9 96) back to the program."

65.  Additionally, Paragraph 6 indicates, "A memo will be written to the student by the program director that will include information about their dismissal/ deceleration, that they will be switched to Graduate Exploratory, and that they should contact Student Accounts and Financial Aid (if applicable). If the student is decelerated and has a successful appeal, they will then be changed back to the program. If the student's appeal is successful, a memo will be written notifying Graduate Admissions to restore student's PA major code and which program catalog year the student will follow."

66.  In addition to Defendant's Policy Manual, Defendant has a "Master of Science Physician Assistant Studies Clinical Clerkships Experience Manual Academic for Year 2019-2020." On page 6, it states: "Students are representatives of their reputation, the Slippery Rock University reputation and the reputation of the physician assistant profession. This includes respect and professionalism shown to all staff, personnel, preceptors, fellow students and patients encountered during the clinical year and throughout their Physician Assistant career."

67.  Page 7 of Defendant's manual explains students must "Display professional behavior at all times during clinical rotations. This includes but is not limited to:

    - Following all policies/procedures, completing required forms, and providing patient/family centered care at all times.

-   Maintaining respect and dignity of patients, faculty, peers, staff and other members of the community.

-   Accepting feedback and asking for suggestions for improvement of clinical skills.

-   Seeking out opportunities to perform procedures on the Recommended Procedure List for the clerkship."

68.     Furthermore, Defendant's manual indicates that "Students must obey all HIPAA requirements, which includes: avoiding discussions about patient care issues in hallways, elevators, cafeteria or other public locations; securing all patient documentation and not discussing specific patient situations outside of the designated care team."

69.     Under the "Professionalism" section on page 9, the Defendant states: "Remember that you are representing Slippery Rock University, the Physician Assistant Program, yourself and the profession on a daily basis. The Slippery Rock Physician Assistant Program expects all students to behave in the highest of standards that is expected of any health care provider. Physician Assistant students have a responsibility to patients, faculty, preceptors and ALL members of the healthcare team to maintain the highest standards of professionalism… If at any time unprofessional behavior is identified it may lead to failure of the clerkship and/or dismissal from the Slippery Rock Physician Assistant program."

70.     According to Defendant, examples of unprofessional behavior include, in part: "Violation of HIPAA standards in any form," "Insubordination to a preceptor or faculty member."

71.     Defendant specifies on page 8, "Students who display unprofessional behavior will have documentation of these interactions placed in their student file and be subject to disciplinary action. Repeated offenses may result in dismissal from the program."

72.     In addition, Defendant states that "All professionalism standards as addressed in the Program Policy Manual must be adhered to at all times."

73.     Plaintiff admits that she signed documentation from Wellington Retreat acknowledging her receipt, recognition, and understanding of their rules.

74.     Wellington Retreat policies do not prohibit students from having guests.

75.     Wellington Retreat is technically a secure facility, but students come and go as they please, and residents and staff frequently let others into the facility without identification.

76.     Wellington Retreat's "Guidelines for Students" specifies, "No product containing alcohol or any illicit or controlled substances are allowed on-site except for physician prescribed stimulants. Violating this policy will result in immediate expulsion from the educational program."

77.     In addition, their Guidelines state, "Students cannot be or arrive on-site under the influence of alcohol or any other illicit and controlled substance. Violating this policy will result in immediate expulsion from the educational program."

78.     Plaintiff admitted to consuming a couple of drinks on the evening of February 29, 2020.

79.     Plaintiff was not working or on call during that evening.

80.     Plaintiff was not participating in program activities.

81.     Plaintiff was not under the influence of alcohol or any illicit or controlled substance on program facility grounds.

82.     Plaintiff did not bring alcohol or any illicit or controlled substances to the facility.

83.     Plaintiff did not violate any HIPAA regulations.

84.     Plaintiff did not discuss patient care issues or have any patient records in her room.

85.     Plaintiff's classmate who was involved in this incident at Family Centers for Recovery/Wellington Retreat was a fellow student in Defendant's Physician Assistant Graduate Program.

86.     Plaintiff's classmate was initially dismissed from the Program, but she was later permitted to re-enter Defendant's Physician Assistant Graduate Program.

87.     Plaintiff completed eight (8) out of ten (10) clinical rotations.

88.     Plaintiff was dismissed from her ninth rotation.

89.     Plaintiff has never had any other disciplinary issues.

90.     Defendant dismissed Plaintiff from the entire Physician Assistant Studies Graduate Program on March 23, 2020.

91.     Defendant's letter to Plaintiff dated March 23, 2020 states, "According to Page 29 in the Slippery Rock Physician Assistant program policy manual, a student who is dismissed from a clinical site based on inappropriate behavior or unprofessional conduct is subject to program dismissal. The conduct exhibited by you at Family Centers for Recovery/Wellington Retreat was inappropriate and unprofessional thus resulting in your dismissal from the program."

92.     Plaintiff asked Defendant for an opportunity to appeal or challenge their decision.

93.     Defendant told Plaintiff there was no process for reconsideration.

94.    Defendant did not give Plaintiff an opportunity to appeal its decision or offer her an alternative to have the decision be reconsidered.

95.    Plaintiff contacted the Dean of Slippery Rock University to request reconsideration of the Physician Assistant Program's decision to prohibit an appeal, and the Dean said it was up to the Physician Assistant Program to decide.

96.    Plaintiff continues to request an opportunity to complete her graduate program's requirements.

**COUNT I: VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS**

97.    All preceding paragraphs are incorporated herein.

98.    The Fourteenth Amendment of the United States Constitution guarantees due process: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

99.    In Gati v. Univ. of Pittsburgh of Com. Sys. of Higher Educ., 91 A.3d 723 (2014), the Court held: "The United States Supreme Court has held that public schools, as state actors, must adhere to the strictures of federal procedural due process." Goss v. Lopez, 419 U.S. 565, 574 (1975). "The Fourteenth Amendment forbids the State to deprive any person of life, liberty, or property without due process of law." Id. at 572.

100.    In the university context[,] due process is defined according to whether the

institution is public or private. As stated in Boehm v. Univ. of Pennsylvania Sch. of

Veterinary Med., 573 A.2d 575 (1990)…, "the law is fairly well established that in a

state owned college or university, due process requires notice and some opportunity

for hearing before a student is disciplined."

101.    In the landmark decision of Dixon v. Alabama State Board of Education, 294 F.2d

150 (5th Cir.1961), *cert. denied*, the United States Court of Appeals for the Fifth

Circuit held "that due process requires notice and some opportunity for hearing

before a student at a tax-supported college is expelled for misconduct." Id. at 158.

102.    The Court went on to explain:

> The notice should contain a statement of the specific charges
> and grounds which, if proven, would justify expulsion under the
> regulations of the Board of Education. The nature of the hearing
> should vary depending upon the circumstances of the particular case.
> The case before us requires something more than an informal interview
> with an administrative authority of the college. By its nature, a charge
> of misconduct, as opposed to a failure to meet the scholastic standards
> of the college, depends upon a collection of the facts concerning the
> charged misconduct, easily colored by the point of view of the witnesses.
> In such circumstances, a hearing which gives the Board or the
> administrative authorities of the college an opportunity to hear both
> sides in considerable detail is best suited to protect the rights of all
> involved. This is not to imply that a full-dress judicial hearing, with the
> right to cross-examine witnesses, is required. Such a hearing, with the
> attending publicity and disturbance of college activities, might be
> detrimental to the college's educational atmosphere and impractical to
> carry out. Nevertheless, the rudiments of an adversary proceeding may be
> preserved without encroaching upon the interests of the college. In the
> instant case, the student should be given the names of the witnesses
> against him and an oral or written report on the facts to which each
> witness testifies. He should also be given the opportunity to present to the
> Board, or at least to an administrative official of the college, his own
> defense against the charges and to produce either oral testimony or written
> affidavits of witnesses in his behalf. If the hearing is not before the Board
> directly, the results and findings of the hearing should be presented in a
> report open to the student's inspection. If these rudimentary elements of

fair play are followed in a case of misconduct of this particular type, we feel that the requirements of due process of law will have been fulfilled. Id. at 158–159. *See*: Gorman v. University of Rhode Island, 837 F.2d 7 (1st Cir.1988); Esteban v. Central Missouri State College, 415 F.2d 1077 (8th Cir.1969), *cert. denied*, 398 U.S. 965 (1970); Jaska v. Regents of University of Michigan, 597 F.Supp. 1245 (E.D.Mich.1984), *aff'd*, 787 F.2d 590 (6th Cir.1986); Herman v. University of South Carolina, 341 F.Supp. 226 (D.S.C.1971), *aff'd*, 457 F.2d 902 (4th Cir.1972). *See also*: Board of Curators of University of Missouri v. Horowitz, 435 U.S. 78 (1978); Goss v. Lopez, 419 U.S. 565 (1975); Jones v. Snead, 431 F.2d 1115 (8th Cir.1970); Wasson v. Trowbridge, 382 F.2d 807 (2d Cir.1967); Barker v. Hardway, 283 F.Supp. 228 (S.D.W.Va.1968), *aff'd*, 399 F.2d 638 (4th Cir.1968), *cert. denied*, 394 U.S. 905, (1969).

103.    "A college is a unique institution which, to the degree possible, must be self-governing and the courts should not become involved in that process unless the process has been found to be biased, prejudicial or lacking in due process." Schulman v. Franklin & Marshall Coll., 538 A.2d 49, 52 (1988) (*en banc* ).

104.    Plaintiff was a student in Defendant's Physician Assistant Studies Graduate Program.

105.    Defendant is a state-owned public university.

106.    Defendant receives state and federal tax dollars.

107.    Defendant violated Plaintiff's due process right to be heard.

108.    Defendant held two meetings to address concerns regarding Plaintiff's actions during a clinical rotation.

109.    Defendant failed to identify with any specificity the grounds for which it may dismiss Plaintiff from her graduate program.

110.    Defendant failed to conduct a hearing to address the concerns.

111.    Defendant held two informal meetings with university faculty.

112.    The meetings on March 4, 2020, and March 18, 2020 consisted of informal interviews with university staff.

113.    Plaintiff did not have notice of the specific charges or claims being brought against her by the Defendant.

114.    Defendant vaguely stated that Plaintiff engaged in "unprofessional" conduct.

115.    Defendant failed to preserve the rudiments of an adversary proceeding.

116.    Defendant failed to provide a witness list.

117.    Defendant failed to provide Plaintiff with an oral or written report on the facts to which each witness would testify.

118.    Plaintiff was provided with an opportunity to provide a statement.

119.    Defendant did not have a chairperson present at either meeting.

120.    Defendant's meetings with Plaintiff regarding this disciplinary issue were not before the University Board or the entirety of the Physician Assistant Studies Board or Committee.

121.    Defendant failed to provide the results and findings of the hearing in a report open to the student's inspection.

122.    Defendant failed to explain or report what specific behavior was deemed "unprofessional conduct" to the point of requiring dismissal.

123.    Plaintiff was not put on notice with respect to the specific actions that rose to the level of unprofessional behavior.

124.    Plaintiff was not using or under the influence of alcohol while participating in a program activity.

125.    Plaintiff was not under the influence of alcohol or using alcohol on program facility grounds.

126.    Plaintiff did not violate patient confidentiality or violate HIPAA.

127.    Plaintiff was dismissed from the Wellington Retreat clinical rotation.

128.    Defendant's PA Student Handbook does not require dismissal for the above-mentioned sanctions, but it indicates a student "may be subject to dismissal."

129.    Defendant rejected Plaintiff's request to decelerate her or put her on probationary status to continue her graduate program.

130.    Defendant failed to explain or report why Plaintiff's alleged actions required dismissal, but the identical actions of her classmate permitted reinstatement.

131.    Plaintiff asked the Physician Assistant Studies Department how she could appeal the decision to dismiss her, and she was told there was no process or opportunity to appeal.

132.    Other students in the same program as Plaintiff have been given the opportunity to appeal dismissals from the Physician Assistant Studies Program.

133.    Plaintiff contacted the Dean of Slippery Rock University and she was told that if the Physician Assistant program did not permit her to appeal, then there was nothing Defendant could do.

134.    Defendant breached Plaintiff's due process rights by failing to conduct appropriate disciplinary proceedings to address allegations of misconduct and unprofessionalism.

135.    Defendant's policies and procedures do not afford a student who believes that he or she has not been afforded due process with any recourse.

136.     Defendant breached Plaintiff's due process rights by preventing Plaintiff from

         appealing the decision to dismiss her from the Physician Assistant Studies Graduate

         Program.

## COUNT II: VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS PROPERTY INTEREST

137.     All preceding paragraphs are incorporated herein.

138.     "The protection of procedural due process attaches to property interests arising

         from, *inter alia,* entitlements created by state statute." Gati v. Univ. of Pittsburgh of

         Com. Sys. of Higher Educ., 91 A.3d 723 (2014).

139.     Furthermore, in Gati, the Court explained:

> Concerning public institutions of higher learning, the Supreme Court has
> assumed, without deciding, that students have a constitutionally protected
> property right in their continued enrollment. Regents of the Univ. of Mich. v.
> Ewing, 474 U.S. 214, 222–23, (1985); Board of Curators of the Univ. of Mo. v.
> Horowitz, 435 U.S. 78, 84–85, (1978).
> …
> In any event, "the right of a student to attend a public or private college or
> university is subject to the condition that he comply with its scholastic and
> disciplinary requirements[.]" Boehm v. Univ. of Penn. Sch. of Veterinary
> Medicine, 573 A.2d 575, 578 (Pa. Super 1990). Said another way, the essence
> of the bargain between student and university is as follows: "A student has a
> reasonable expectation based on statements of policy by [the school] and the
> experience of former students that if he performs the required work in a
> satisfactory manner and pays his fees he will receive the degree he seeks." Ross
> v. Penn. State Univ., 445 F.Supp. 147, 152 (M.D.Pa.1978). Gati v. Univ. of
> Pittsburgh of Com. Sys. of Higher Educ., 91 A.3d 723, 730 (2014).

140.     The Court in Borrell v. Bloomsburg Univ., 955 F. Supp. 2d 390 (M.D. Pa. 2013)

         held:

> Courts in the Third Circuit have repeatedly recognized that a graduate student
> has a property interest protected by procedural due process in the continuation
> of his or her course of study under Pennsylvania law. *See* Coulter v. East
> Stroudsburg Univ., No. 10–CV–0877, 2010 WL 1816632, at *2 (M.D.Pa. May
> 5, 2010); Manning v. Temple Univ., No. Civ. A. 03–4012, 2004 WL 3019230,
> at *8 (E.D.Pa. Dec. 30, 2004) ("Under Pennsylvania law, it has been held that a
> graduate student has a property interest protected by procedural due process in

the continuation of her course of study."); <u>Stoller v. College of Medicine</u>, 562 F.Supp. 403, 412 (M.D.Pa.1983); <u>Ross v. Penn. State Univ.</u>, 445 F.Supp. 147, 153 (M.D.Pa.1978). Indeed, this Court noted in <u>Ross</u> that graduate students have "a reasonable expectation based on statements of policy by [the university] and the experience of former students that if [they] perform the required work in a satisfactory manner and pay [their] fees [they] will receive the degree [they] seek." <u>Ross</u>, 445 F.Supp. at 152.

141.    Similarly, the Plaintiff in this case has a property interest in her continued participation in the Physician Assistant Graduate Studies Program in pursuit of her graduate degree.

142.    Plaintiff had successfully completed five (5) semesters of her graduate program.

143.    Plaintiff had successfully completed eight (8) out of ten (10) clinical rotations.

144.    Plaintiff's goal was to continue working toward her graduate degree and to meet all graduation requirements.

145.    Plaintiff expected to be able to continue the required work in Defendant's program.

146.    Plaintiff continues to seek readmission into the Physician Assistant Graduate Studies Program to complete all necessary graduation requirements in accordance with Defendant's policies and procedures.

## <u>COUNT III: VIOLATION OF THE FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE UNDER "CLASS OF ONE" THEORY</u>

147.    All preceding paragraphs are incorporated herein.

148.    The Equal Protection Clause of the Fourteenth Amendment directs that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

149.    In <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562 (2000), the Supreme Court outlined the "class of one" theory of equal protection.

150.    Under a "class of one" claim, a plaintiff asserts that "he has been intentionally

treated differently from others similarly situated and there is no rational basis for the difference in treatment." Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006) (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)).

151.　According to the Third Circuit, to state a "class of one" claim, a plaintiff must allege that "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." Hill, 455 F.3d at 239.

152.　In Borrell v. Bloomsburg Univ., 955 F. Supp. 2d 390 (M.D. Pa. 2013), the Court explained: "[p]ersons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects,' " Mun. Revenue Servs., Inc. v. McBlain, 347 Fed.Appx. 817, 825 (3d Cir.2009) (quoting Startzell v. City of Phila., 533 F.3d 183, 203 (3d Cir.2008)), "the law in the Third Circuit does not require [the plaintiff] to show that the [comparators] are identical in all relevant respects but only that they are alike." Southersby Dev. Corp. v. Borough of Jefferson Hills, 852 F.Supp.2d 616, 628 (W.D.Pa.2012) (citing Startzell, 533 F.3d at 203); see also Simmermon v. Gabbianelli, 932 F.Supp.2d 626, 632–33 (D.N.J.2013); Thomas v. Coopersmith, No. 11–7578, 2012 WL 3599415, at *5 (E.D.Pa. Aug. 21, 2012).

153.　"Determining whether an individual is 'similarly situated' to another individual is a case-by-case fact-intensive inquiry." Chan v. Cnty. of Lancaster, No. 10–3424, 2011 WL 4478283, at *15 (E.D.Pa. Sept. 26, 2011) (citing Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 305 (3d Cir.2004)).

154.　Here, Plaintiff was a student in Defendant's Physician Assistant Studies Graduate Program.

155.    Plaintiff was living in Florida with a fellow student in the exact same program.

156.    Plaintiff and her classmate were both participating in the same clinical rotation.

157.    Plaintiff and her classmate were both alleged to have committed the same misconduct.

158.    Plaintiff and her classmate were both dismissed and removed from the clinical rotation at Wellington Retreat.

159.    Plaintiff and her classmate were both subject to discipline by Defendant.

160.    Plaintiff and her classmate were both dismissed from the Physician Assistant Studies Graduate Program.

161.    Plaintiff's classmate was later permitted to reenter the program and to continue her studies.

162.    Plaintiff was not permitted to appeal her dismissal from Defendant's program.

163.    Plaintiff has not been afforded the opportunity to continue her education in the Physician Assistant Studies Graduate Program.

164.    Other students in the same Graduate Program have been dismissed, and have then been given an opportunity to reenter the Physician Assistant Studies Graduate Program.

## COUNT IV: BREACH OF CONTRACT

165.    All preceding paragraphs are incorporated herein.

166.    To establish a breach of contract claim under Pennsylvania law, a party must establish: the existence of a contract; a breach of duty imposed by the contract; and damages. Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003). When it interprets a contract, a court must determine the intent of the parties and it must

give effect to all provisions of the contract. <u>Krizovensky v. Krizovensky</u>, 624 A.2d 638, 642 (Pa. 1993).

167.    The implied duty of good faith in Pennsylvania "is not limitless. Rather, there must be some relationship to the provisions of the contract itself to invoke the duty of good faith." <u>W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank</u>, 712 F.3d 165, 170 (3d Cir. 2013).

168.    In <u>Haywood v. University of Pittsburgh</u>, the district court explained that a breach of the implied duty of good faith is a breach of contract between the parties. 976 F.Supp. 2d 606, 627 (W.D. Pa. 2013).

169.    The determination of whether a party failed to exercise good faith in the performance of a contract is fact-based. Id.

170.    "The covenant of good faith may also be breached when a party exercises discretion authorized in a contract in an unreasonable way." <u>Id</u>. (*quoting* <u>Montanez v. HSBC Mortg. Corp</u>., 876 F.Supp. 2d 504, 513 (E.D. Pa. 2012)) (quotation removed).

171.    "Specific performance compels the surrender of a thing in itself, because that thing is unique and cannot by its nature be duplicated." <u>Cimina v. Bronich</u>, 537 A.2d 1355, 1357 (Pa. 1988).

172.    Plaintiff is likely to succeed on the merits of her breach of contract claim, as she has established all three elements. *See* <u>Ware</u>, 322 F.3d at 225.

173.    First, Plaintiff was privy to a contractual relationship when she enrolled in Defendant's institution and paid her tuition.

174.    It is well established in Pennsylvania that suits may be brought by students against colleges and universities for breach of contract where the institution ignores or

violates portions of the written contract. See  Cavaliere v. Duff's Business Inst., 605 A.2d 397, 404 (Pa. Super. Ct. 1992) (finding that a breach of contract suit against a private educational institution would be theoretically viable in certain circumstances); Crabtree v. California Univ. of Pennsylvania, 606 A.2d 1239, 1240 (Pa. Commw. Ct. 1990) (refusing to hold that a university catalog constituted a contract between a private university and a student, but nonetheless finding that, if the catalog was a contract, the university did not violate the contract); Boehm, 573 A.2d at 579 (stating that the relationship between a private college and its students is contractual in nature); Merrow v. Goldberg, 672 F.Supp. 766, 774 (D.Vt.1987); Petock v. Thomas Jefferson University, 630 F.Supp. 187, 191 (E.D.Pa.1986); Jansen v. Emory University, 440 F.Supp. 1060 (N.D.Ga.1977), aff'd, 579 F.2d 45 (5th Cir. 1978).

175.   Plaintiff in this case also went to the Dean of the University and requested an appeal.

176.   Defendant's Dean told Plaintiff that the Physician Assistant Studies Graduate Program operated under its own set of rules, separate and apart from Defendant's general policies and procedures.

177.   Defendant's Dean rejected Plaintiff's request go appeal her dismissal from the Graduate Program.

178.   Plaintiff received a student handbook for "Student Guidelines for Program Learning Policies & Procedures Master of Science in Physician Assistant Studies Academic Year 2019-2020."

179.   Plaintiff also received the "Slippery Rock University Master of Science Physician Assistant Studies Clinical Clerkships Experience Manual Academic Year 2019-2020."

180.   Plaintiff paid tuition to participate in this program during the 2019-2020 program academic year.

181.   Plaintiff was in good standing both academically and professionally until the incident in question on March 1, 2020.

182.   Defendant breached the contract by failing to adhere to its own program guidelines, policies, and procedures.

183.   As a result of Defendant's breach, Plaintiff suffered damages in the form of dismissal from her graduate program of choice, almost two years into the program.

184.   This breach cannot be remedied by a refund in tuition or any other equitable remedy.

185.   The facts clearly establish Plaintiff's right to specific performance, as no adequate remedy at law exists.

186.   Justice requires that Defendant permit Plaintiff to re-enter its Physician Assistant Studies Graduate Program and to work toward completing graduation requirements.

187.   Plaintiff's reinstatement and admission into the Defendant's program is the only remedy that would put her back into the place she would be but for Defendant's actions. See Cimina, 537 A.2d at 1358.

188.   Plaintiff has established the damages caused by Defendant's breach, and she has demonstrated her entitlement to specific performance that will require Defendant to

permit Plaintiff to reenroll and to participate in its Physician Assistant Graduate Program.

WHEREFORE, Plaintiff requests that this Court enter judgment in her favor and against Defendant as follows:

a) Defendant shall permit Plaintiff to re-enroll in its Master of Science Physician Assistant Studies Graduate Program and afford her the opportunity to complete all program requirements;

b) Plaintiff's transcript will be revised to remove the "dismissal" from the Spring 2020 section;

c) Attorneys' fees and costs will be reimbursed; and

d) Such other relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Kristen C. Weidus*
Kristen C. Weidus, Esq.
Attorney I.D. No. 313486
Ruder Law
One Oxford Center
301 Grant Street, Suite 270
Pittsburgh, PA 15219
Phone: (412) 281-4959
Fax: (412) 291-1389
Email: kristenweidus@ruderlaw.com

*/s/ Lisa Postlewait*
Lisa Postlewait, Esq.
Attorney I.D. No. 309606
Ruder Law
One Oxford Center
301 Grant Street, Suite 270
Pittsburgh, PA 15219
Phone: (412) 281-4959
Fax: (412) 291-1389
Email: lisapostlewait@ruderlaw.com