IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| J.C., a minor, by and through his parents and natural guardians, Mr. J.C. and Mrs. K.C., and Mr. J.C. and Mrs. K.C., in their own right,<br><br>**Plaintiffs,**<br><br>v.<br><br>South Hills Assembly of God, Hillcrest Christian Academy,<br><br>**Defendant.** | Civil Action<br><br>No. _____<br><br>**Jury Trial Demanded** |

# COMPLAINT

As set forth below, J.C., a minor by and through his parents and natural guardians, Mr. J.C. and Mrs. K.C., and Mr. J.C.a and Mrs. K.C. in their own right, by and through the undersigned counsel, Kristen C. Weidus, Esquire, and Ruder Law, LLC, claim violations of Title VI of the Civil Rights Act of 1964, breach of contract under Pennsylvania law, intentional infliction of emotional distress under Pennsylvania law, and liability for student-on-student harassment under federal law. Mr. J.C. and Mrs. K.C. allege that South Hills Assembly of God, Hillcrest Christian Academy discriminated against their son on the basis of his race and ethnicity. In doing so, Defendant not only violated federal law, but also breached the contract entered into by the Parties. Additionally, Plaintiffs allege that Defendant, by failing to address the pervasive bullying J.C. was experiencing, intentionally or recklessly caused the development of J.C.'s severe eating disorder, anxiety and depression, and post-traumatic stress disorder.

1

Finally, Plaintiffs allege that due to the severity, pervasiveness, and objectively offensive nature of the student-on-student harassment, the Defendant school board is liable for damages.

## PARTIES

1. Plaintiffs, Mr. J.C. and Mrs. K.C., are residents of Jefferson Hills, Pennsylvania. Their son, Plaintiff J.C., attended Defendant from August 2017 through December 2020. JC is a Black, Hispanic student with diagnoses of an eating disorder – restrictive eating disorder with exercising; anxiety with OCD traits; and situational depression.

2. Defendant South Hills Assembly of God, Hillcrest Christian Academy is a private, Christian school serving students in kindergarten through Grade 12. It is located in Bethel Park, Pennsylvania.

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as Defendant is located in this venue and the events giving rise to the claims at issue occurred in the venue.

## FACTUAL ALLEGATIONS

5. Mr. J.C. and Mrs. K.C. are parents of J.C. J.C. is a sixteen-year-old student who, until December 2020, attended Defendant for junior high and high school. J.C. is a Black, Hispanic student and has been diagnosed with an eating disorder, anxiety, depression, and post-traumatic stress disorder (PTSD).

6. J.C. began attending Defendant in August 2017.

7. Starting in or around August 2020, J.C. began experiencing bullying by Defendant classmates. A student, later identified as A.P., had instigated the ostracization of J.C. on the

basis of him being Black and/or Hispanic. This information was learned through text messages sent from J.C. to his girlfriend.

8. This racial harassment led J.C. to experience severe emotional and physical distress.

9. On September 9, 2020, J.C.'s pediatrician, Dr. Tonja DiCamillo, submitted a confidential report of his diagnosis of J.C. to Defendant. Dr. DiCamillo included in her letter that "in the last few months [J.C. had] become excessively more obsessed with his weight, eating habits, and exercise." She shared that she currently would "diagnose [J.C.] with an eating disorder – restrictive eating disorder with exercising; anxiety with OCD traits; and situational depression."

10. On September 10, 2020, Plaintiffs had a meeting with Defendant where they informed Mr. George Wilson and Pastor Zach of the bullying being perpetrated against J.C. by several classmates. Plaintiffs requested that the school investigate and closely monitor the complicit students.

11. On September 16, 2020, Plaintiffs emailed Defendant to recap the action points from the September 10 meeting. The topics discussed by the Parties were that (a) all of J.C.'s teachers should be aware of the seriousness of his health concerns; (b) understanding the exclusion J.C. was experiencing by his classmates; and (c) the school's responsibility to enforce school rules and conduct.

12. J.C. began seeing Frank E. Colosimo, LPC, on September 30, 2020, for Eye Movement Desensitization and Reprocessing (EMDR) therapy. At that time, J.C. presented with no verbal communication, and exhibited both intense anger towards his parents as well as severe anxiety related to the trauma at school.

13. On or around October 13, 2020, J.C. was asked by his gym teacher to jump on a mat. As a result of his jump, J.C. broke his arm (specifically, the humerus bone) in two.

14. J.C.'s injury was not addressed properly by Defendant, as he was sent to the office alone and provided with only an ice pack. It was not until roughly one hour later that J.C. was permitted to call his parents, who ultimately were forced to take him to the hospital to have his broken arm treated.

15. What was originally a trip to the hospital to address J.C.'s broken arm turned into a 28-day stay at Children's Hospital. From October 13 through November 10, 2020, J.C. was admitted as an inpatient to address not only his arm but also the escalation of his eating disorder.

16. Beginning on November 11, 2020, and continuing for two weeks, J.C. participated in full-time day programming at the Center for Eating Disorders at UPMC Western Psychiatric Hospital.

17. On November 20, 2020, the Parties met at the request of Plaintiffs to express their concern about J.C.'s health and the school-based interactions affecting his wellbeing. At the meeting, Plaintiffs provided Defendant with multiple documents supporting their position, including but not limited to:

    a. Letters from J.C.'s pediatrician and therapist with details of his condition as well as his trauma-related diagnoses.

    b. Email exchanges between Plaintiffs, Mr. George Wilson, and Pastor Zach, during which Defendant's bullying policy was discussed.

    c. Text messages with Ms. McCowan, requesting that she follow up with the situation involving students talking behind J.C.'s back at the beginning of the school year.

    d. Text messages that Plaintiffs sent to A.P.'s family, requesting a meeting to address the situation instigated by A.P., to which no reply was received.

    e. Pictures of J.C. before and after the physical effects of his eating disorder.

    f. Pictures of the X-ray of J.C.'s broken arm.

    g. Video recording of students A.P. and J.N., confirming misconduct in violation of school policy.

    h. Copies of page 32 and page 35 of Defendant's student handbook, outlining relevant offenses, specifically the Level 2 Offense of Bullying and the Level 4 Offense of Gross Misconduct.

18. On December 8, 2020, the Parties met for a second time via Zoom, prompted by Plaintiffs' discovery of the reason for J.C.'s mistreatment. In a text message to his girlfriend, J.C. confided that A.P. encouraged his friends to exclude J.C. from all groups and socialization because J.C. is Black.

19. On December 9, 2020, Mr. J.C. sent an email to Defendant, documenting the two meetings the Parties had with each other. (See ¶¶ 16, 17). Plaintiffs reminded Defendant that this was the second time J.C. had been subjected to race-based harassment in conjunction with the school, the first time being when the brother of a classmate, both students at Defendant, called J.C. the "N-word" in 6th grade. Plaintiffs reiterated that race-based harassment is both intolerable and illegal, and requested that Defendant take immediate and appropriate steps to investigate and respond to the harassment.

20. Upon information and belief, Defendant never responded to Plaintiffs' December 9th email.

21. On December 12, 2020, J.C. began intensive EMDR therapy with Mr. Colosimo at his Shadyside office, continuing with weekly sessions through March 13, 2021.

5

22. Based on the extreme trauma experienced by J.C. as a result of the racially hostile environment at Defendant, Mr. J.C. and Mrs. K.C. withdrew J.C. from Defendant at the end of December 2020.

23. In January 2021, J.C. began attending a new school to finish the remainder of his 10th grade year. Although in a more positive environment, he has been traumatized to the point of not wanting to talk about what happened while enrolled at Defendant. J.C. shakes and gets nervous when the harassment is discussed.

24. J.C. has continued to require and receive mental health support as he continues to recover physically and mentally from his PTSD.

## **COUNT I: DISCRIMINATION UNDER TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**

25. Plaintiffs incorporate the allegations in paragraphs 5 through 24 above as though fully set forth herein.

26. Title VI of the Civil Rights Act of 1964 provides specific protections to members of protected classes from being excluded from participation in, denied the benefits of, or subjected to discrimination under any program or activity receiving Federal funding.

27. The classes protected under Title VI are race, color, and national origin.

28. To establish a cause of action under Title VI, a plaintiff must demonstrate that he or she is (1) a member of a protected class; (2) qualified for the educational benefit or program at issue; (3) suffered an adverse action; (4) which occurred under circumstances giving rise to an inference of intentional discrimination. *Pinkney v. Meadville, Pennsylvania*, 2021 WL 37664 (W.D. Pa. Jan. 5, 2021), quoting *Saravanan v. Drexel Univ.*, 2017 WL 4532243, 8 (E.D. Pa. Oct. 10, 2017).

29. J.C. is a Black, Hispanic young man. Therefore, he is a member of a protected class under Title VI.

30. J.C., as an enrolled student with Defendant at the time of the harassment in question, was qualified to attend school and receive education at Defendant.

31. J.C. suffered pervasive harassment at the hands of students who also were enrolled at Defendant, in the form of organized ostracization of J.C.

32. This harassment was instigated because of the color of J.C.'s skin; that is, students organized to ostracize J.C. because he is Black.

33. Because of the context of this harassment, it is evident that this discrimination against J.C. was intentional.

34. Upon information and belief, Defendant receives federal funding.

35. The record supports Plaintiffs' discrimination claim, and thus, Defendant violated the rights provided to them by Title VI of the Civil Rights Act of 1964.

WHEREFORE, Plaintiffs, by and through their attorneys, demand judgment for compensatory and punitive damages against Defendant together with court costs, attorneys' fees, interest, and all other relief permitted by the Court.

## COUNT II: BREACH OF CONTRACT

36. Plaintiffs incorporate the allegations in paragraphs 5 through 35 above as though fully set forth herein.

37. Pennsylvania Courts apply a contract law analysis when assessing disputes between students and private schools. *See Hart v. Univ. of Pittsburgh*, No. CIV.A. 13-399, 2014 WL 4218616 (W.D. Pa. Aug. 25, 2014).

38. "The contract between a private institution and a student is comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution." *Gati v. University of Pittsburgh of Commw. Sys. of Higher Ed.*, 91 A.3d 723, 731 (Pa.Super. 2014) (*quoting Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa.Super. 1999)).

39. A court, therefore, must review any and all agreements entered into between the parties, contained within the school-issued student handbook, as a court would do with any other agreement between private parties. *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480 (Pa.Super. 2007).

40. In the event that this Honorable Court determines that a written contract does not exist, Plaintiffs contend that an implied contract existed between the parties.

41. An implied contract is one where the parties assent to the formation of a contract, but instead of being expressed in words, the intention to contract is inferred from the conduct of the parties in light of surrounding circumstances including a course of conduct. *Highland Sewer and Water Authority v. Forest Hills Mun. Auth.*, 797 A.2d 385, 391 (Pa. Cmwlth. 2002) *citing Crawford's Auto Ctr., Inc. v. Com., Pa. State Police*, 655 A.2d 1064 (Pa. Cmwlth. 1995).

42. To establish a breach of contract claim under Pennsylvania law, a party must establish: (1) the existence of a contract; (2) a breach of duty imposed by the contract, and (3) damages. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003). *See also Gazarov ex rel. Gazarov v. Diocese of Erie*, 80 F. App'x 202 (3d Cir. 2003) (citation omitted).

43. Upon information and belief, all families are required by Defendant to sign the Parent and Student Handbook ("Handbook") at the beginning of each school year.

44. The 2020-2021 Handbook states on Page 2 that the documents provide families "with the general policies and procedures of HCA." It states that it is "not an all-inclusive statement of [HCA] rules…" and that the "administration reserves the right to determine acceptable actions, behavior, and conduct." Finally, the Handbook states that the parents' "signature on the *Student Application* is your acceptance of Academy policies."

45. On page 21 of the Handbook, Defendant defines "bullying" as "repeated and intentional harassment whereby student(s) are targeted verbally, nonverbally or physically." Defendant notes that bully includes "ostracism, harassment on-line and/or with the cell phone, as well as face-to-face confrontation." Further, Defendant notes that relational aggression is "the manipulation of social relationships" such as "the purposeful exclusion of a child from play or social groups."

46. Defendant considers bullying to be a Level 2 Offense, as described on pages 21 and 32 of the Handbook, and notes that it is "unacceptable and will not be tolerated."

47. On pages 28 - 29 of the Handbook, Defendant outlines its Discipline Policy, explicitly stating that "if the student's behavior or attitude indicates an uncooperative spirit or one that is out of harmony with the spirit and standards at Hillcrest Christian Academy, whether or not there is a definite breach of conduct, he/she may be requested to transfer."

48. On pages 35 - 36 of the Handbook, Defendant outlines what it has codified as Level 4 Offenses. Included as a Level 4 Offense is Gross Misconduct, defined as "behavior on or off campus that is in conflict with the purpose or spirit of Hillcrest Christian Academy."

49. Based on the foregoing paragraphs, it is evident that a contract existed between Plaintiffs and Defendant. This contract included the duty of Defendant to maintain a safe environment for all students such as J.C., free from bullying and gross misconduct.

50. Defendant breached the duty owed to Plaintiffs when it failed to intervene and appropriately discipline the students perpetrating the race-based harassment of J.C. and creating the racially hostile environment.

51. Because of this breach, J.C. suffered continual, severe mental anguish, manifesting physically in an eating disorder, anxiety and depression, and PTSD.

52. Further, Plaintiffs suffered additional damages through the effects of J.C.'s mental and physical trauma on the entire family; the accrual of cost to provide J.C. with life-saving physical and mental healthcare; missing work in order to care for J.C. during his medical treatment; and the accrual of cost to transport J.C. to a new school.

53. Therefore, the record supports Plaintiffs' breach of contract claim.

WHEREFORE, Plaintiffs, by and through their attorneys, demand judgment for compensatory and punitive damages against Defendant together with court costs, attorneys' fees, interest, and all other relief permitted by the Court.

## COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

54. Plaintiffs incorporate the allegations in paragraphs 5 through 53 above as though fully set forth herein.

55. The Supreme Court of Pennsylvania refers to the Restatement of Torts for guidance in addressing claims of Intentional Infliction of Emotional Distress (IIED). *See McNeal v. City of Easton*, 598 A.2d 638, 640 (Pa. Cmwlth. 1991). Specifically, the Court has stated that "[t]he gravamen of the tort of intentional infliction of emotional distress is outrageous conduct on the part of the tortfeasor." *Id.* (internal citation omitted).

56. Pennsylvania courts have also enumerated the elements of IIED as when "(1) a person who by extreme and outrageous conduct (2) intentionally or recklessly causes (3) severe emotional distress to another." *Carson v. City of Phila.*, 574 A.2d 1184 (Pa. Cmwlth. 1990).

57. Defendant student A.P. organized his classmates to ostracize J.C. because of the color of his skin. This is undeniably extreme and outrageous conduct.

58. This ostracization caused severe emotional distress to J.C. in the form of PTSD and an eating disorder.

59. At minimum, A.P.'s conduct recklessly caused this harm to J.C. This honorable Court may also find A.P.'s conduct to have intentionally caused harm to J.C.

60. Defendant, as the school where A.P. was enrolled as a student, had a duty to discipline A.P. for his infliction of emotional distress on J.C. See ¶¶ 44 through 47, above.

61. Defendant was made aware of A.P.'s harassment of J.C.

62. Upon information and belief, Defendant did not intervene to stop the harassment. This inaction to prevent and mitigate racial harassment is both extreme and outrageous conduct on the part of Defendant, a school that claims it finds bullying to be unacceptable and intolerable.

63. Defendant's conduct (that is, the inaction regarding A.P.'s harassment of J.C.) recklessly caused J.C. to suffer severe emotional distress amidst a rampantly hostile environment.

64. Because of Defendant's inaction, J.C. developed PTSD, as well as an eating disorder, anxiety, and depression, the culmination of which resulted in J.C. breaking his arm, being admitted to Children's Hospital, spending two weeks in a full-time eating disorder clinic, and transferring to a new school.

65. Therefore, the record supports Plaintiffs' claim of IIED.

WHEREFORE, Plaintiffs, by and through their attorneys, demand judgment for compensatory and punitive damages against Defendant together with court costs, attorneys' fees, interest, and all other relief permitted by the Court.

## IV. LIABILITY FOR STUDENT-ON-STUDENT HARASSMENT

66. Plaintiffs incorporate the allegations in paragraphs 5 through 65 above as though fully set forth herein.

67. The Supreme Court has held that a school board may be liable for damages in cases of student-on-student harassment wherein the harassment is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (S. Ct. 1999).

68. The bullying that began in or around August 2020 at the instigation of student A.P. was so severe and pervasive that J.C. developed an eating disorder, began manifesting characteristics of anxiety and depression, and was additionally diagnosed with PTSD.

69. Due to the manifestation of his eating disorder, J.C. missed several weeks of school due to a 28-day hospitalization and two weeks of full-day, intensive clinical treatment.

70. Due to his PTSD, Plaintiffs were forced to withdraw J.C. from Defendant's program and to transfer him to a new educational setting that was not racially hostile.

71. Therefore, Defendant is liable for the student-on-student harassment suffered by J.C. at the hands of students, including A.P.

WHEREFORE, Plaintiffs, by and through their attorneys, demand judgment for compensatory and punitive damages against Defendant together with court costs, attorneys' fees, interest, and all other relief permitted by the Court.

## COUNT V: VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT

72. Plaintiffs incorporate the allegations in paragraphs 5 through 71 above as though fully set forth herein.

73. J.C., as a Black, Hispanic student, is a member of a protected class.

74. Defendant is a public accommodation as defined by the Pennsylvania Human Relations Act.

75. J.C. suffered pervasive harassment at the hands of students who also were enrolled at Defendant, in the form of organized ostracization of J.C.

76. This harassment was instigated because of the color of J.C.'s skin; that is, students organized to ostracize J.C. because he is Black.

77. Because of the context of this harassment, it is evident that this discrimination against J.C. was intentional.

78. Defendant's actions violated Section 5(i)(1) of the Pennsylvania Human Relations Act.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court award Plaintiffs all appropriate remedies available under the Pennsylvania Human Relations Act for these violations.

Respectfully submitted,

RUDER LAW, LLC

*/s/ Kristen C. Weidus*
Kristen C. Weidus, Esq.
Attorney I.D. No. 313486
One Oxford Center
301 Grant Street, Suite 270
Pittsburgh, PA 15219
Phone: (412) 281-4959
Fax: (412) 291-1389
Email: kristenweidus@ruderlaw.com